172 F.3d 1092
 OREGON NATURAL DESERT ASSOCIATION; Rest the West; Portland
Audubon Society; Trout Unlimited; Oregon Wildlife
Federation; Northwest Environmental Defense Center; Oregon
Natural Resources Council; Pacific Rivers Council; Oregon
Natural Resources Coalition, Plaintiffs-Appellees,
and
The Confederated Tribes of the Warm Springs Reservation of
Oregon, Plaintiff-Intervenor-Appellee,
v.
Michael P. DOMBECK, in his official capacity as Chief of the
United States Forest Service, Defendant-Third
Party Defendant-Appellant.
Oregon Natural Desert Association; Rest the West; Portland
Audubon Society; Trout Unlimited; Oregon Wildlife
Federation; Northwest Environmental Defense Center; Oregon
Natural Resources Council; Pacific Rivers Council; Oregon
Natural Resources Coalition, Plaintiffs-Appellees,
and
The Confederated Tribes of the Warm Springs Reservation of
Oregon, Plaintiff-Intervenor-Appellee,
v.
Jack Ward Thomas, in his official capacity as Chief of the
United States Forest Service, Defendant,
and
Eastern Oregon Public Land Coalition; Robert Burril, Grant
County, a Political subdivision of the State of
Oregon, Defendants-Intervenors/Third
Party Plaintiffs-Appellants.
 Nos. 97-35065, 97-35112.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 10, 1998.
Decided July 22, 1998.
 
 Nancy B. Firestone, Assistant United States Attorney, Washington, DC; Daniel E. O'Leary, Davis Wright Tremaine, Portland, Oregon; Ronald S. Yockim, Roseburg, Oregon, for the appellants.
 Michael Axline, Western Environmental Law Center, Eugene, Oregon; Howard G. Arnett, Karnopp, Petersen, Noteboom, Hubel, Hansen & Arnett, Bend, Oregon, for the appellees.
 Appeals from the United States District Court for the District of Oregon; Ancer L. Haggerty, District Judge, Presiding. D.C. No. CV-94-00522-ALH.
 Before: SCHROEDER, FARRIS, and TASHIMA, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 The United States Forest Service appeals the district court's ruling that pollution from cattle grazing is subject to the certification requirement of § 401 of the Clean Water Act, 33 U.S.C. § 1341. This appeal requires us to consider whether the term "discharge" in § 1341 includes releases from nonpoint sources as well as releases from point sources. We conclude from the language and structure of the Act that the certification requirement of § 1341 was meant to apply only to point source releases. Accordingly, we reverse.
 
 
 2
 The background of this case can be briefly described. In 1993 the Forest Service issued a permit allowing Robert and Diana Burril to graze 50 head of cattle in Oregon's Malheur National Forest. The cattle graze several months a year in and around Camp Creek and the Middle Fork of the John Day River, polluting these waterways with their waste, increased sedimentation, and increased temperature. In 1994 Oregon Natural Desert Association (ONDA) filed an action under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, as well as the Administrative Procedures Act, 5 U.S.C. § 702. ONDA alleged that the Forest Service had violated 33 U.S.C. § 1341 by issuing the grazing permit without first obtaining the State of Oregon's certification that the grazing would not violate the state's water quality standards. The Burrils, Grant County, and the Eastern Oregon Public Lands Coalition intervened as defendants and the Confederated Tribes of the Warm Springs Reservation intervened as plaintiffs. The district court granted the plaintiffs' summary judgment motion, concluding that the Forest Service must obtain certification for activities that will potentially cause nonpoint source pollution.
 
 Standing
 
 3
 We first address the Intervenor/Appellants' contention that ONDA lacks standing to bring this suit. To establish standing a plaintiff must demonstrate: (1) the invasion of a legally-protected interest; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that the court can redress the injury by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). ONDA is an environmental group whose members live adjacent to the John Day River and use it for recreation. There is no question that the river's pollution has injured them. See Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (Harm to a plaintiff's aesthetic and environmental well-being is a cognizable injury.); Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir.1992) (An organization has standing by alleging injury to individual members.).
 
 
 4
 The Intervenor/Appellants argue that by challenging the lack of certification, ONDA has alleged "only a procedural injury," and thus has not demonstrated a concrete injury or the likelihood of redressability. The legal requirement ONDA seeks to impose is one that would affect the reality of the environment. This is a case, therefore, where plaintiffs seek "to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." Lujan, 504 U.S. at 572, 112 S.Ct. 2130. We have held threatened harm to "health, recreational use, and enjoyment" from the use of herbicides constitutes an impairment of a concrete interest. Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 (9th Cir.1994). Certainly, ONDA has demonstrated a concrete interest where its members reside and engage in recreational activities along polluted waterways.
 
 
 5
 For similar reasons, the appellants' argument that there is no redressable injury must fail. Appellants suggest that ONDA must prove either that the state would deny certification or that certification would necessitate a change in the grazing operation. To establish redressability, however, the plaintiffs need not demonstrate that the ultimate outcome following proper procedures will benefit them. See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1518 (9th Cir.1992). The Supreme Court has recognized that the assertion of a procedural right is "special" and reduces the plaintiff's burden of proving immediacy and redressability. Lujan, 504 U.S. at 572 n. 7, 112 S.Ct. 2130. ONDA stands in a similar position to the hypothetical plaintiff, discussed in Lujan, who lives adjacent to the construction site for a federally-licensed dam. The Court noted that such a plaintiff could challenge a federal agency's failure to prepare an Environmental Impact Statement, even though the plaintiff could not establish that the EIS would alter the construction plan for the dam or even that the dam would be completed in the near future. See id. Here, ONDA asserts a similar procedural right of certification under § 1341.
 
 Citizen Suit Provision
 
 6
 Appellants argue that even if ONDA has standing to sue under Article III, its suit is not authorized under the Clean Water Act's citizen suit provision. That statute provides that any citizen may bring a civil action against an agency alleged to be in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a). "Effluent standard or limitation" is defined to include "certification under section 1341 of this title." 33 U.S.C. § 1365(f)(5).
 
 
 7
 Appellants contend that the statute authorizes suits to enforce only the discharge limitations already contained within state certifications. The statute on its face is not so limited. Section 1365(f) cross-references the entirety of section 1341, which provides in relevant part that "No license or permit shall be granted until the certification required by this section has been obtained...." 33 U.S.C. § 1341(a). An agency that has issued a permit without the appropriate certification is in violation of the certification requirement under § 1341 and therefore in violation of an "effluent standard or limitation" under § 1365. The statute authorizes any citizen to bring a suit against such an agency, in this case the Forest Service.
 
 
 8
 Appellants' reliance on Bennett v. Spear, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), is misplaced. The Court there held that a citizen could not invoke the Endangered Species Act's general civil suit provision to sue the Secretary of the Interior for a discretionary act, when a separate, specific provision authorized suits against the Secretary only for nondiscretionary acts. See id. 117 S.Ct. at 1166. There is no similar limitation in the Clean Water Act that would restrict citizen suits to challenges of certifications already granted. It authorizes suits for violation of certification requirements.
 
 The Merits
 
 9
 The crux of this case is whether the Burrils' Forest Service grazing permit requires certification from the State of Oregon. The resolution of this question hinges on the interpretation of the term "discharge" as used in § 1341. That section provides:
 
 
 10
 Any applicant for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates ... that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title.... No license or permit shall be granted until the certification required by this section has been obtained or has been waived....
 
 
 11
 The Clean Water Act defines point sources as "discernible, confined and discrete conveyances" such as a pipe, ditch, or machine. 33 U.S.C. § 1362. Other pollution sources, such as runoff from agriculture or in this case, animal grazing, are nonpoint sources. See id.; Oregon Natural Resources Council v. United States Forest Serv., 834 F.2d 842, 849 n. 9 (9th Cir.1987).
 
 
 12
 The appellees argued before us and the district court that "discharge" in § 1341 refers to pollution from both point sources and nonpoint sources. In accepting this argument below, the district court relied exclusively on § 502 of the Act, which provides:
 
 
 13
 (12) The term "discharge of a pollutant" [means] any addition of any pollutant to navigable waters from any point source....
 
 
 14
 (16) The term "discharge" when used without qualification includes a discharge of a pollutant....
 
 
 15
 33 U.S.C. § 1362. The district court reasoned that because the unqualified term "discharge" is defined as including, but not limited to, point source releases, it must include releases from nonpoint sources as well. The court therefore concluded that the term "discharge" encompassed nonpoint source pollution like runoff from grazing. It rejected the government's position that the unqualified term "discharge" is limited to point sources but includes both polluting and nonpolluting releases.
 
 
 16
 We review this question of law de novo. See Torres-Lopez v. May, 111 F.3d 633, 638 (9th Cir.1997). We examine "the language of the governing statute, guided not by a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object and policy." John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank, 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). The Clean Water Act, when examined as a whole, cannot support the conclusion that § 1341 applies to nonpoint sources.
 
 
 17
 We have discussed at length the impact of the 1972 enactment of the Clean Water Act, which largely supplanted the 1970 Water and Environmental Quality Improvement Act by replacing water quality standards with point source effluent limitations.
 
 
 18
 Prior to 1972, Congress attempted to control water pollution by focusing regulatory efforts on achieving "water quality standards," standards set by the states specifying the tolerable degree of pollution for particular waters. See EPA v. State Water Resources Control Board, 426 U.S. 200, 202-03, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). This scheme had two important flaws. First, the mechanism of enforcement was cumbersome. Regulators had to work backward from an overpolluted body of water and determine which entities were responsible; proving cause and effect was not always easy. Second, the scheme failed to provide adequate incentives to individual entities to pollute less; an entity's dumping pollutants into a stream was ignored if the stream met the standards. Id. The scheme focused on "the tolerable effects rather than the preventable causes" of pollution. Id.
 
 
 19
 In 1972, Congress passed the Clean Water Act, which made important amendments to the water pollution laws. The amendments placed certain limits on what an individual firm could discharge, regardless of whether the stream into which it was dumping was overpolluted at the time.... The Act thus banned only discharges from point sources. The discharge of pollutants from nonpoint sources--for example, the runoff of pesticides from farmlands--was not directly prohibited. The Act focused on point source polluters presumably because they could be identified and regulated more easily that nonpoint source polluters.
 
 
 20
 Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1316 (9th Cir.1990) (footnote omitted).
 
 
 21
 The Clean Water Act thus overhauled the regulation of water quality. Direct federal regulation now focuses on reducing the level of effluent that flows from point sources. This is accomplished through the issuance of permits under the National Pollutant Discharge Elimination System (NPDES). See 33 U.S.C. § 1342. The Act prohibits the release of pollutants from point sources except in compliance with an NPDES permit. 33 U.S.C. § 1311.
 
 
 22
 Nonpoint source pollution is not regulated directly by the Act, but rather through federal grants for state wastewater treatment plans. Section 208 of the Act requires each such plan to contain procedures for the identification and control of nonpoint source pollution. 33 U.S.C. § 1288(b)(2). If the EPA approves a state's plan, it may make grants to the state to defray the costs of administering the plan, see 33 U.S.C. § 1288(f), or to construct facilities, see 33 U.S.C. § 1288(g). Thus, the Act provides no direct mechanism to control nonpoint source pollution but rather uses the "threat and promise" of federal grants to the states to accomplish this task. Shanty Town Assocs. Ltd. Partnership v. EPA, 843 F.2d 782, 791 (4th Cir.1988); see also Natural Resources Defense Council v. EPA, 915 F.2d at 1316 n. 3 (CWA does not penalize nonpoint source polluters). Section 1329, added to the Act in 1987, requires states to adopt nonpoint source management programs and similarly provides for grants to encourage a reduction in nonpoint source pollution. See Natural Resources Defense Council v. EPA, 915 F.2d at 1318.
 
 
 23
 We recognized the Act's separate treatment of point and nonpoint source pollution in Oregon Natural Resources Council v. United States Forest Service, 834 F.2d at 842. There, an environmental group attempted to use the Act's citizen suit provision to enjoin a logging operation that caused nonpoint source pollution. The Act allows a citizen to sue for the violation of an effluent limitation under 33 U.S.C. § 1311. See 33 U.S.C. § 1365(f)(2). The plaintiffs argued that the effluent limitations of § 1311 applied to nonpoint sources by virtue of § 1311(b)(1)(C), which referenced state water quality standards. We rejected this argument as contrary to the structure and plain language of the Act. "The title and construction of section 1311(b)(1) lead us to the logical conclusion that the limitations set forth in section 1311(b)(1)(C) are 'effluent limitations' and, therefore, by definition, applicable only to point sources." Id. at 850.
 
 
 24
 We must reach the same conclusion with regard to the scope of the term "discharge" in § 1341. Prior to 1972, the provision required the state to certify that a licensed activity would "not violate applicable water quality standards." Pub.L. 91-224, § 21(b)(1), 84 Stat. 91 (1970). Now, the statute requires certification that any discharge from the licensed activity "will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317" of Title 33. 33 U.S.C. § 1341(a)(1). The statute was thus amended "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants." S.Rep. No. 414, at 69 (1971), reprinted in 1972 U.S.C.C.A.N. at 3764, 3735. The term "discharge" in § 1341 is limited to discharges from point sources.
 
 
 25
 All of the sections cross-referenced in § 1341 relate to the regulation of point sources. Appellees contend section 1313, requiring states to establish water quality standards, relates to nonpoint source pollution because it addresses water quality standards and implementation plans. The section does not itself regulate nonpoint source pollution. Water quality standards are established in part to regulate point source pollution. They provide "a supplementary basis ... so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." EPA v. California ex. rel. State Water Resources Control Bd., 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). In Oregon Natural Resources Council, 834 F.2d at 850, we held that the reference to water quality standards in § 1311(b)(1)(C) did not sweep nonpoint sources into the scope of § 1311. For similar reasons, § 1313 does not sweep nonpoint sources into the scope of § 1341.
 
 
 26
 Appellees' reliance on the Supreme Court's decision in PUD No. 1 v. Washington Dep't of Ecology, 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994), is similarly misplaced. In that case, the State of Washington issued a § 1341 certification for a dam, conditioned on minimum stream flows in order to protect fisheries. The Court held that such a condition was permissible under § 1341 even though it did not relate to an effluent discharge from the dam. Thus, a state is free to impose such water-quality limitations "once the threshold condition, the existence of a discharge, is satisfied." Id. at 712, 114 S.Ct. 1900. The Supreme Court in PUD No. 1 did not broaden the meaning of the term "discharge" under § 1341. All parties conceded that the construction of the dam would result in discharges from both the release of dredge and fill material and the release of water through the dam's tailrace. See id. at 711, 114 S.Ct. 1900. Both of these releases, however, would involve point sources; the tailrace is a conveyance and the dredge and fill operation presumably would involve a conveyance or rolling stock. See 33 U.S.C. 1362(14).
 
 
 27
 The terminology employed throughout the Clean Water Act cuts against ONDA's argument that the term "discharge" includes nonpoint source pollution like runoff from grazing. Neither the phrase "nonpoint source discharge" nor the phrase "discharge from a nonpoint source" appears in the Act. Rather, the word "discharge" is used consistently to refer to the release of effluent from a point source. By contrast, the term "runoff" describes pollution flowing from nonpoint sources. The term runoff is used throughout 33 U.S.C. § 1288, describing urban wastewater plans, and 33 U.S.C. § 1314(f), providing guidelines for identification of nonpoint sources of pollution. Section 1341 contains no reference to runoff.
 
 
 28
 Had Congress intended to require certification for runoff as well as discharges, it could easily have written § 1341 to mirror the language of § 1323, which directs federal agencies "engaged in any activity which may result in the discharge or runoff of pollutants" to comply with applicable water quality standards. 33 U.S.C. § 1323(a). Section 1323 plainly applies to nonpoint sources of pollution on federal land. ONDA does not seek relief under this provision, however, because absent the issuance of an NPDES permit under § 1342, a citizen suit under the Clean Water Act may not be based on a violation of 33 U.S.C. § 1323. See 33 U.S.C. § 1365(f).
 
 
 29
 We have recognized the distinction between the terms "discharge" and "runoff":
 
 
 30
 Nonpoint source pollution is not specifically defined in the Act, but is pollution that does not result from the "discharge" or "addition" of pollutants from a point source. Examples of nonpoint source pollution include runoff from irrigated agriculture and silvicultural activities.
 
 
 31
 Oregon Natural Resources Council, 834 F.2d at 849 n. 9. We have further noted that "Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants. Such runoff could not be traced to any identifiable point of discharge." Trustees for Alaska v. EPA, 749 F.2d 549, 558 (9th Cir.1984).
 
 
 32
 Appellees contend that we must adopt the district court's interpretation of "discharge" because that term is defined more broadly than "discharge of pollutants ... from any point source." They argue that "discharge" may only be the broader term if it includes releases from nonpoint sources. This is incorrect. "Discharge" is the broader term because it includes all releases from point sources, whether polluting or nonpolluting. The D.C. Circuit reached this conclusion in National Wildlife Fed'n v. Gorsuch, 693 F.2d 156 (D.C.Cir.1982). There, the court interpreted "discharge" in § 1362(16) of the Act to include the release from a point source of turbid water that did not contain any pollutant. This is the logical interpretation of § 1362(16) that comports with the structure and lexicon of the Clean Water Act.
 
 
 33
 Intervenor/Appellee Confederated Tribes suggests that the grazing of cattle is "sufficiently similar" to point source pollution to require its inclusion in the definition of the term "discharge." The cattle in question wade in the John Day River and thus introduce their waste directly into the stream. The Tribes argue that we should not distinguish between the manmade conveyances that define a point source and cattle, whose range is normally controlled by manmade structures such as fences. The Clean Water Act, however, does not include animals in its definition of point sources. See 33 U.S.C. § 1362(14). It would be strange indeed to classify as a point source something as inherently mobile as a cow. We agree with the Second Circuit that the term "point source" does not include a human being, or any other animal. See United States v. Plaza Health Labs., Inc., 3 F.3d 643, 649 (2d Cir.1993).
 
 
 34
 The Tribes also suggest that these cattle may constitute a "concentrated animal feeding operation" under § 1362(14). This position is not tenable. Even assuming that open range grazing could be classified as a concentrated animal feeding operation, a question we do not reach, the controlling regulations make the determination as to whether feeding operations of this size must be certified a discretionary decision of the state NPDES program Director. See 40 C.F.R. 122.23(c). Neither the Director nor the record of any state administrative proceeding is before us.
 
 CONCLUSION
 
 35
 For these reasons we hold that certification under § 1341 is not required for grazing permits or other federal licenses that may cause pollution solely from nonpoint sources.
 
 
 36
 The judgment of the district court is REVERSED and the matter REMANDED for entry of judgment in favor of the defendant.