**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CENTRAL SIERRA ENVIRONMENTAL
RESOURCE CENTER; SIERRA FOREST
LEGACY,
                    *Plaintiffs-Appellants*,

v.

STANISLAUS NATIONAL FOREST;
UNITED STATES FOREST SERVICE;
JASON KUIKEN, Forest Supervisor of
Stanislaus National Forest,
                    *Defendants-Appellees*,

ROBERT BRENNAN; SHERRINE
BRENNAN; JESSE RIEDEL; JENNY
RIEDEL; CLIFTON HODGE;
CALIFORNIA FARM BUREAU
FEDERATION; CALIFORNIA
CATTLEMEN'S ASSOCIATION;
STANISLAUS NATIONAL FOREST
GRAZING PERMITEES ASSOCIATION,
                    *Intervenor-Defendants-
                            Appellees*.

No. 19-16711

D.C. No.
1:17-cv-00441-
LJO-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted October 14, 2020
San Francisco, California

Filed April 8, 2022

Before:  Ferdinand F. Fernandez, Kim McLane Wardlaw,
and Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

---

## SUMMARY[*]

---

### Environmental Law

The panel affirmed the district court's summary judgment order, in which the district court rejected plaintiff environmental groups' challenges to the government's allowance of livestock grazing in three areas of the Stanislaus National Forest in California.

In 1981, the California State Water Resources Control Board signed a Management Agency Agreement ("MAA") with the U.S. Forest Service to formally recognize it as the management agency on Forest Service lands to implement water management plans.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The U.S. Forest Service issued grazing permits in three allotments at issue here – the Bell Meadow, Eagle Meadow, and Herring Creek Allotments (the "BEH Allotments"). Plaintiffs alleged that the Forest Service's allowance of livestock grazing in the BEH Allotments led to fecal matter runoff that polluted streams in the area, and this impaired their members' ability to recreate in the relevant areas of the Stanislaus National Forest. The BEH Allotments fall under the jurisdiction of the Central Valley Regional Water Quality Control Board, whose Basin Plan defines the beneficial uses for the subject waterways and the water quality objectives that would protect those beneficial uses. The only claim at issue in this appeal alleged that the government violated § 313 of the Clean Water Act by failing to comply with several requirements of California's Porter-Cologne Water Quality Control Act.

The panel held that the plaintiffs had Article III standing under the associational standing doctrine. At least one member of each plaintiff organization averred that they regularly hike in all three Allotments and that the physical impacts of the cattle grazing impair their present and anticipated enjoyment of the area, including its creeks and streams. This showing was sufficient to establish an Article III injury-in-fact.

In alleging a violation of § 313 of the Clean Water Act, plaintiffs first contended that the government violated California's Porter-Cologne Act by failing to file a discharge report and by discharging waste without first obtaining either water discharge requirements ("WDR"s) or a waiver. The panel held that the MAA clearly established that, in lieu of filing reports and obtaining WDRs, the Forest Service would instead implement the agreed-upon Best Management Practices ("BMP"s) and the provisions of the MAA.

Second, plaintiffs asserted that the MAA was superseded by the State Board's adoption of the 2004 "Policy for Implementation and Enforcement of the Nonpoint Source Pollution Control Program" ("2004 NPS Policy"). The panel held that this argument was refuted by the text of that document. That the Forest Service is working with the regional board on options for replacing the MAA did not establish that the MAA has already been replaced. Accordingly, the panel concluded that plaintiffs failed to show that government violated the reporting and permitting requirements of Cal. Water Code §§ 13260, 13263, and 13264. The panel affirmed the district court's summary judgment on these issues.

Plaintiffs also alleged that the government violated § 313 of the Clean Water Act by authorizing livestock grazing that caused runoff that led to fecal coliform levels in local waterways in excess of the relevant water quality objectives in the Central Valley Regional Board's Basin Plan. The panel held that the argument failed because the Basin Plan objectives did not apply directly, of their own force, to individual dischargers but instead reflected standards that regulators must take into account in fashioning the requirements that do apply to dischargers (such as WDRs, waivers, and basin-plan prohibitions). The panel affirmed the district court's summary judgment to defendants with respect to plaintiffs' claims based on asserted violations of the basis plan's water quality objectives.

## COUNSEL

Peter MK Frost (argued), Western Environment Law Center, Eugene, Oregon, for Plaintiffs-Appellants.

Brian C. Toth (argued) and Robert J. Lundman, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environmental Enforcement Section, United States Department of Justice, Washington, D.C.; Stephen A. Vaden, General Counsel; James L. Rosen, Attorney; United States Department of Agriculture, Washington, D.C.; for Defendants-Appellees.

Scott A. Keller (argued), Lehotsky Keller LLP, Washington, D.C.; Kari E. Fisher, California Farm Bureau Federation, Sacramento, California; Caroline Lobdell, Western Resources Legal Center, Portland, Oregon; for Intervenor-Defendants-Appellees.

## OPINION

COLLINS, Circuit Judge:

Plaintiffs Central Sierra Environmental Resource Center ("CSERC") and Sierra Forest Legacy ("SFL") appeal the district court's summary judgment order rejecting their challenges to the Government's allowance of livestock grazing in three areas of the Stanislaus National Forest. Plaintiffs contend that, in allowing such grazing, the Government has violated multiple provisions of state water quality laws made applicable to the Government under the Clean Water Act. We affirm.

## I

Before turning to the specific factual background of this case, we begin with an overview of the relevant water quality laws that frame the parties' dispute.

## A

As rewritten in 1972, the Federal Water Pollution Control Act, popularly known as the "Clean Water Act" (the "Act"), 33 U.S.C. § 1251 *et seq.*, aimed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also PUD No. 1 of Jefferson Cnty. v. Washington Dep't. of Ecology*, 511 U.S. 700, 704 (1994). "To achieve these ambitious goals, the Clean Water Act establishes distinct roles for the Federal and State Governments." *PUD No. 1*, 511 U.S. at 704. In particular, "the Administrator of the Environmental Protection Agency (EPA) is required . . . to establish and enforce technology-based limitations on individual discharges into the country's navigable waters from *point sources*." *Id*. (emphasis added) (citing 33 U.S.C. §§ 1311, 1314). Section 502 of the Act defines a "point source" to mean "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged," such as a "pipe" or a "ditch." 33 U.S.C. § 1362(14). As we have previously held, however, "runoff from . . . animal grazing"—which is the form of pollution at issue here—does not fit this definition and is therefore considered to be a "*nonpoint* source[]." *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998) (emphasis added).[1] The

---

[1] We therefore have no occasion in this case to address or apply any provisions of federal or state law specifically addressing regulation of pollution from point sources.

Clean Water Act "provides no direct mechanism to control nonpoint source pollution" and instead "uses the 'threat and promise' of federal grants" to incentivize the States to do so. *Id*. at 1097.

Specifically, to "encourag[e] and facilitat[e] the development and implementation of areawide waste treatment management plans," § 208 of the Act requires the States to designate, for specified geographic areas, "an organization capable of developing effective areawide waste treatment management plans for such area." 33 U.S.C. § 1288(a), (a)(2). Such plans are more commonly known as "[w]ater quality management (WQM) plan[s]," *see* 40 C.F.R. § 130.2(k), and they must contain a variety of elements, including "procedures and methods" to control "agriculturally and silviculturally related nonpoint sources of pollution, including . . . runoff from manure disposal areas, and from land used for livestock and crop production." 33 U.S.C. § 1288(b)(2)(F). Section 208(c) also requires States to designate "one or more" agencies for each geographic area to carry out the relevant WQM plans. *Id*. § 1288(c)(1). In addition to WQM plans under § 208, the Clean Water Act requires States, under § 319, "to adopt nonpoint source management programs," and it "similarly provides for grants to encourage a reduction in nonpoint source pollution." *Dombeck*, 172 F.3d at 1097 (citing 33 U.S.C. § 1329).

Notably, § 313(a) of the Act requires any federal "department, agency, or instrumentality" that has "jurisdiction over any property or facility" or that "engage[s] in any activity resulting, or which may result, in the discharge or runoff of pollutants" to "comply with[] all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution in

the same manner, and to the same extent as[,] any nongovernmental entity." 33 U.S.C. § 1323(a). Accordingly, federal agencies managing federal lands generally must comply with the water pollution laws and regulations of the relevant State, including the State's laws concerning discharges from nonpoint sources.

The Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), *see* Cal. Water Code § 13000 *et seq.*, is "the principal law governing water quality regulation in California." *Monterey Coastkeeper v. Central Coast Reg'l Water Quality Control Bd.*, ___ Cal. Rptr. 3d ___, 2022 WL 669903, at *1 (Ct. App. Feb. 10, 2022). It established the State Water Resources Control Board ("State Board") along with nine regional water quality control boards ("regional boards"). *See* Cal. Water Code §§ 13100, 13200, 13201; *see also id.* § 175. These ten agencies have "primary responsibility for the coordination and control of water quality" in California. *Id.* § 13001.

The State Board formulates and adopts statewide water quality control policies that are binding on the regional boards. *See* Cal. Water Code §§ 13140, 13141, 13146, 13240. The State Board also "may adopt water quality control plans" for "waters for which water quality standards are required by" the Clean Water Act. *Id.* § 13170. Any such water quality control plans adopted by the State Board "supersede any regional water quality control plans for the same waters to the extent of any conflict." *Id.*

Subject to the approval of the State Board, each regional board must "formulate and adopt water quality control plans" for its respective region, *id.* § 13240; *see also id.* § 13245, which are commonly known as "basin plans," *Monterey Coastkeeper*, 2022 WL 669903, at *1. These basin plans must specify, "for the waters within a specified

area," each of the following: (1) the "[b]eneficial uses to be protected"; (2) the applicable "[w]ater quality objectives," *i.e.*, "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area"; and (3) a "program of implementation needed for achieving" those objectives. CAL. WATER CODE § 13050(h), (j)(1)–(3). In establishing "water quality objectives," the regional board must consider several nonexhaustive statutory factors, including the relevant "[e]nvironmental characteristics," the "[w]ater quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area," and general "[e]conomic considerations." *Id*. § 13241. In formulating a program of implementation, the regional board must provide a "description of the nature of [the] actions which are necessary to achieve the objectives," a "time schedule" for such actions, and a "description" of the "surveillance to be undertaken to determine compliance with objectives." *Id*. § 13242. In addition to these programmatic elements, a basin plan may contain specific prohibitions, *i.e.*, it "may specify certain conditions or areas where the discharge of waste, or certain types of waste, will not be permitted." *Id*. § 13243.

In addition to developing overall basin plans, the regional boards are responsible for regulating the specific actions of relevant dischargers through "permitting, inspection, and enforcement actions." *Monterey Coastkeeper*, 2022 WL 669903, at *1. Among the primary mechanisms regional boards use to regulate discharges are (1) the receipt of statutorily required reports concerning discharges and (2) the issuance of discharge permits. *See*

*Department of Finance v. Commission on State Mandates*, 378 P.3d 356, 361–62 (Cal. 2016).

Specifically, unless the reporting requirement has been waived under § 13269, the Porter-Cologne Act requires each "person discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state" to file with the appropriate regional board a "report of the discharge, containing the information that may be required by the regional board." *See* CAL. WATER CODE § 13260(a)(1). After receiving the report, "[t]he regional board then 'shall prescribe requirements as to the nature' of the discharge." *Department of Finance*, 378 P.3d at 361 (quoting CAL. WATER CODE § 13263(a)). Such "waste discharge requirements" ("WDRs") are "the equivalent of the term 'permits' as used" in the Clean Water Act, *see* CAL. WATER CODE § 13374, and they authorize the relevant person to make the specified discharges in accordance with those requirements. *See id*. §§ 13263(f), 13264, 13265. In formulating such WDRs for specific discharges, the regional board "shall implement" any relevant basin plan, and "shall take into consideration," *inter alia*, "the beneficial uses to be protected, the water quality objectives reasonably required for that purpose, other waste discharges, [and] the need to prevent nuisance." *Id*. § 13263(a).[2]

Alternatively, the regional board may issue a waiver of the need for WDRs for a "specific discharge or type of discharge." *Id*. § 13269(a)(1). The waiver must set forth

---

[2] The State Board also has the authority to issue WDRs under § 13263. *See* CAL. WATER CODE § 13263(j). Moreover, under specified circumstances, either the State Board or a regional board may "prescribe *general* waste discharge requirements for a *category* of discharges." *Id*. § 13263(i) (emphasis added).

certain conditions, and it must generally provide for appropriate monitoring and reporting of the covered discharges. *Id*. § 13269(a)(2). As a general matter, in the absence of WDRs under § 13263 or a waiver under § 13269, no person "shall initiate any new discharge of waste or make any material changes in any discharge." *Id*. § 13264(a). Because an applicable waiver under § 13269 authorizes the relevant discharges, *see id*. § 13264(a)(3), it is in that sense also functionally equivalent to a permit.

## B

In 1981, the State Board signed a Management Agency Agreement ("MAA") with the United States Forest Service ("Forest Service"). The MAA formally recognized the State's designation of the Forest Service, pursuant to § 208(c) of the Clean Water Act, "as the management agency for all activities on NFS [*i.e.*, National Forest System] lands," with responsibility "to implement provisions of water quality management plans." *See* 33 U.S.C. § 1288(c). The MAA references the Forest Service's report entitled "Water Quality Management for National Forest System Lands in California" (also referred to as the "Forest Service 208 Report"), which "describes current Forest Service practices and procedures for protection of water quality." The MAA states that the "State Board [a]grees" that "[t]he practices and procedures set forth in the Forest Service 208 Report constitute sound water quality protection and improvement on NFS lands," except with respect to certain issues that were enumerated in an attachment. As to the items in that attachment, additional "refinement" was needed before they could also be accepted, like the remaining practices and procedures, as "Best Management Practices (BMPs)."

The MAA further states that "[i]t is contemplated by this agreement" that the Forest Service's "reasonable implementation" of the BMPs and the MAA "will constitute compliance with Section 13260, subdivision (a) of Section 13263, and subdivision (b) of Section 13264, Water Code," and that the regional boards will waive the reporting and discharge requirements of those sections. The MAA also states that "nothing herein will be construed in any way as limiting the authority of the State Board, or the Regional Boards in carrying out their legal responsibilities for management, or regulation of water quality."

In 1999, the California Legislature amended the Porter-Cologne Act to require the State Board to "prepare a detailed program" for "implementing the state's nonpoint source management plan." *See* Cal. Water Code § 13369(a). This implementation program must include measures to promote the use of "best management practices." *Id.* § 13369(b)(1). In carrying out this directive, the State Board in 2004 adopted the "Policy for Implementation and Enforcement of the Nonpoint Source Pollution Control Program" ("2004 NPS Policy"). This policy states that "all current and proposed NPS [*i.e.,* nonpoint source] discharges must be regulated under WDRs, waivers of WDRs, or a basin plan prohibition, or some combination of these administrative tools." However, the Policy also acknowledges that "[t]here are agencies . . . with the authority to implement programs to meet water quality objectives and protect beneficial uses" and that "[s]everal of these agencies are formally linked" to the State Board and regional boards through "management agency agreements." The Policy further notes that, while "[a]nother agency's actions pursuant to an . . . MAA" do not automatically fulfill a regional board's obligations "to address the relevant NPS discharges," they "can serve . . . as the basis, in part or in

whole, for a [regional board] waiver of WDRs for the activities covered in these agreements."

In 2009, the State Board adopted a resolution directing staff "to develop and propose a statewide approach to address activities on national forest system lands."  In response, the Board's staff prepared a draft of a formal waiver of WDRs for nonpoint source activities on federal lands, but the Board ultimately rejected the proposal in late 2011.  The State Board also considered adopting a "statewide approach to addressing the water quality impacts from livestock grazing" on both public and private lands, but in 2015 it ultimately rejected that concept as well.  Instead, the State Board left it to each regional board to "determine which actions" concerning livestock operations, "including regulatory actions and effective non-regulatory efforts for BMP implementation, are best suited to protect water quality."  As the parties have noted in their post-argument submissions, the relevant regional board is continuing to work with the Forest Service to develop nonpoint source permits covering Forest Service lands.

## C

The Stanislaus National Forest is located in California's Sierra Nevada Mountains, northwest of Yosemite National Park.  The Forest Service has issued permits allowing livestock grazing in the three allotments within the Park that are at issue here—the Bell Meadow, Eagle Meadow, and Herring Creek Allotments (collectively, the "BEH Allotments").  According to a Forest Service report, the "BEH meadows have had a history of grazing and overgrazing going back to the 1890s."  In the 1920s, the number of livestock allowed to graze in the BEH meadows was "6 to 10 times more than present levels," but stocking levels were reduced in the 1970s.

The current grazing permits for the Bell Meadow, Eagle Meadow, and Herring Creek Allotments were issued, respectively, in November 2016, March 2012, and June 2016; each was modified in 2017. In addition to setting certain conditions in the permits themselves, the Forest Service also issues annual operating instructions that contain specific instructions that are "responsive to conditions that the Forest Service could not or may not have anticipated." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 980–81 (9th Cir. 2006). At the time the district court ruled, the most recent annual operating instructions for the BEH Allotments had been issued in May and June 2018.

According to Plaintiff CSERC, the Forest Service's allowance of livestock grazing in the BEH Allotments has led to fecal matter runoff that has polluted streams in the area. In particular, CSERC contends that local streams contain levels of fecal coliform bacteria in excess of the relevant water quality objective set by the regional board. The BEH Allotments fall under the jurisdiction of the Central Valley Regional Water Quality Control Board ("Central Valley Regional Board"), whose basin plan ("Basin Plan") defines the beneficial uses for the subject waterways and the water quality objectives that would protect those beneficial uses. *See supra* at 8–9. CSERC contends that the designated beneficial uses for several of the relevant waterways include "Water Contact Recreation." That term refers to "recreational activities," such as "swimming, wading," and "fishing," that "involv[e] body contact with water, where ingestion of water is reasonably possible." In setting the "water quality objective" that would protect this beneficial use, the Basin Plan states that (1) the "fecal coliform concentration" in the water may not "exceed a geometric mean of 200/100 ml" based on at least "five samples for any 30-day period"; and (2) no more than "ten

percent of the total number of samples taken during any 30-day period [may] exceed 400/100 ml."  Between 2009 and 2017, CSERC conducted tests on various streams in the BEH Allotments, as well as elsewhere.  As the district court noted, Plaintiffs contend that CSERC's data "demonstrate 136 violations" of the water quality objective "for fecal coliform on the Bell Creek allotment, 12 on the Eagle Meadow allotment, and 23 on the Herring Creek allotment." Indeed, CSERC's testing data led to two of the local streams being included in the list of "impaired waterways" that the State is required to submit to the EPA under § 303(d) of the Clean Water Act.  *See* 33 U.S.C. § 1313(d).  In listing those streams, the Central Valley Regional Board concluded that "grazing animals are a likely potential source of indicator bacteria to these streams."

Alleging that pollution from livestock grazing was impairing their members' ability to recreate in the relevant areas of the Stanislaus National Forest, Plaintiffs CSERC and SFL filed this suit in March 2017 against the Stanislaus National Forest, the Forest Service, and the then-Forest Supervisor in her official capacity (together, the "Government").  Because Plaintiffs' suit sought injunctive relief modifying the grazing arrangements in the BEH Allotments, the district court allowed the holders of the relevant grazing permits, together with several interested organizations (*viz.*, the California Farm Bureau Federation, California Cattlemen's Association, and the Stanislaus National Forest Grazing Permittees Association) to intervene as Defendants (collectively, the "Intervenors").

As the case comes to us, the only claim at issue is the first cause of action in Plaintiffs' operative Third Amended Complaint, which is brought under the Administrative Procedure Act ("APA") and which alleges that the

Government has violated § 313 of the Clean Water Act by failing to comply with several requirements of the Porter-Cologne Act. *See Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 183 (9th Cir. 1990) (holding that the "judicial review provision[s] of the [APA] permit[] private citizens to sue for alleged state water quality control violations from nonpoint sources") (citing *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 848–52 (9th Cir. 1987)). Specifically, Plaintiffs allege that the Government has violated the Porter-Cologne Act in two respects. First, Plaintiffs allege that the Government made new or modified discharges of waste without filing a discharge report as required by § 13260 and without first obtaining WDRs or a waiver in accordance with § 13264(a). Second, Plaintiffs allege that the Government violated the Porter-Cologne Act by "authoriz[ing] livestock grazing on the BEH allotments that has caused violations of state water quality standards for fecal coliform bacteria," as set forth in the Basin Plan.

After the parties filed cross-motions for summary judgment, the district court granted summary judgment to the Government and the Intervenors. After entry of final judgment, Plaintiffs timely appealed.

## II

We have statutory jurisdiction pursuant to 28 U.S.C. § 1291, and we review the district court's grant of summary judgment de novo. *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1033 (9th Cir. 2005).

Although Defendants have not challenged Plaintiffs' Article III standing, we have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). We conclude that Plaintiffs

have standing under the associational standing doctrine recognized in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).

Under that doctrine, an association may establish standing as the representative of its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 343. The second and third requirements are plainly satisfied here: Plaintiffs' claims alleging violation of the Porter-Cologne Act are clearly germane to CSERC's mission to "identify threats to the environment in the central region of the Sierra Nevada" and to SFL's "work[] to protect and restore the forests, wildlands, wildlife, and watersheds of the Sierra Nevada." Nothing about the adjudication of Plaintiffs' claims for declaratory and injunctive relief would require the participation of individual members. And as to the first requirement, Plaintiffs presented, at summary judgment, declarations from members that sufficiently establish their individual Article III standing.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citation omitted). At least one member of each organization averred that she regularly hikes in all three Allotments and that the physical impacts of the cattle

grazing impair her present and anticipated enjoyment of the area, including its creeks and streams. This showing is sufficient to establish an Article III injury-in-fact. *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021) (finding Article III standing where plaintiff organization "presented sworn testimony from several of its members that they lived near the Creek, used it for recreation, and that pollution from the discharged storm water impacted their present and anticipated enjoyment of the waterway"). Construing the evidence in the light most favorable to Plaintiffs, they have made a sufficient showing that these adverse impacts are attributable, at least in part, to the challenged cattle grazing and that those injuries would be redressed by a reduction or elimination of such grazing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Accordingly, Plaintiffs have standing, and we may proceed to the merits.

**III**

As noted earlier, § 313 of the Clean Water Act states that any agency that has "jurisdiction over any property or facility" or that engages in activities that "result[], or which may result, in the discharge or runoff of pollutants" must "comply with," *inter alia*, all "State . . . and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as[,] any nongovernmental entity." 33 U.S.C. § 1323(a). Plaintiffs' sole remaining cause of action is based exclusively on the Government's alleged failure to comply with this provision, and we therefore have no occasion to address whether the Government's challenged conduct here independently violated any other provision of the Act. In

alleging a violation of § 313, Plaintiffs first contend that the Government violated California's Porter-Cologne Act—made applicable by § 313—by failing to file a discharge report and by discharging waste without first obtaining either WDRs or a waiver.[3]  *See* CAL. WATER CODE §§ 13260, 13264(a).   We conclude that the district court properly granted summary judgment to Defendants on this issue.

## A

In reviewing the basic framework of the Porter-Cologne Act, we explained earlier that, absent a waiver of the reporting requirement under § 13269 of the California Water Code, § 13260(a) generally requires any person "discharging waste, or proposing to discharge waste," to file a "report of the discharge" with the relevant regional board. CAL. WATER CODE § 13260(a)(1).   Unless and until the regional board issues either WDRs under § 13263 or a waiver under § 13269, the person shall not "initiate any new discharge of waste or make any material changes in any discharge." *Id*. § 13264(a).

However, the 1981 MAA jointly agreed to by the State Board and the Forest Service specifically addresses those obligations in the following terms:

> It is contemplated by this agreement that Forest Service reasonable implementation of those practices and procedures and of this

---

[3] The parties vigorously dispute whether the Forest Service counts as a discharger who is subject to the relevant provisions of the Porter-Cologne Act.  Because we dispose of this case on other grounds, we need not decide this issue.  We therefore assume *arguendo*, for purposes of this appeal, that the Forest Service is a discharger subject to the Porter-Cologne Act.

agreement will constitute compliance with Section 13260, subdivision (a) of Section 13263, and subdivision (b) of Section 13264, Water Code.  It is further contemplated that these provisions requiring a report of proposed discharge and issuance of waste discharge requirements for nonpoint source discharges will be waived by the Regional Board pursuant to Section 13269, Water Code, provided that the Forest Service reasonably implements those practices and procedures and the provisions of this agreement.

The referenced "practices and procedures" are the BMPs set forth in the Forest Service 208 Report (or, in the case of a few specific issues, those to be agreed upon by the State Board and the Forest Service), and these BMPs were expressly declared to "constitute sound water quality protection and improvement on NFS lands." *See supra* at 11.  By its plain terms, therefore, the MAA provides that implementation of those BMPs "will constitute compliance" with (1) the reporting requirement of "Section 13260"; (2) the obligation to comply with WDRs in § 13263; and (3) the obligation in § 13264 to refrain from discharges absent WDRs or a waiver.[4]  The MAA also expressly states that it is "further contemplated" that the obligations to file a report or to obtain WDRs "will be waived by the Regional Board pursuant to Section 13269." *See* Cal. Water Code § 13269(a)(1) (authorizing waiver of the obligations in "subdivisions (a) and (c) of Section 13260" and "subdivision

---

[4] The MAA references "subdivision (b) of Section 13264," which is the provision providing for enforcement of the obligations set forth in § 13264(a).

(a) of Section 13264"). The MAA thus clearly establishes that, *in lieu of* filing reports and obtaining WDRs, the Forest Service will instead implement the agreed-upon BMPs and the provisions of the MAA.

**B**

The MAA also expressly states, however, nothing in it "will be construed in any way as limiting the authority of the State Board, or the Regional Boards in carrying out their legal responsibilities for management, or regulation of water quality." Moreover, we held in *Northwest Indian Cemetery Protective Ass'n v. Peterson*, 795 F.2d 688 (9th Cir. 1986), *rev'd on other grounds*, 485 U.S. 439 (1988), that the 1981 MAA did not displace the relevant basin plans of the regional boards. *Id*. at 697. As we explained, the BMPs set forth in the MAA "are merely a means to achieve" the water quality objectives of those plans. *Id*. Thus, if the State Board or a regional board concluded that the MAA was no longer an adequate substitute for compliance with the ordinary reporting and permitting processes envisioned in §§ 13260, 13263, and 13264, those entities could take appropriate steps to abrogate the MAA and to require compliance with those ordinary processes in accordance with their terms. Plaintiffs contend that the MAA has been superseded here, but we disagree.

Plaintiffs assert that the MAA was superseded by the State Board's adoption of the 2004 NPS Policy, but this argument is refuted by the text of that document. The Policy expressly references, as still operative, the "memoranda of understanding (MOUs) or management agency agreements (MAAs)" that the State Board and regional boards have with other agencies. Moreover, the Policy reaffirms that, in the case of an MAA in which the State Board has "designate[d] another agency as a management agency to take the lead in

implementing NPS pollution control," the "fundamental purpose" of such an MAA is to achieve "at least the same degree of control over NPS pollution as could be attained through direct regulation under [State Board or regional board] authority, but to do so more efficiently." Because the 1981 MAA expressly recognizes the Forest Service's designation as "the management agency for all activities on NFS lands," this language from the 2004 NPS Policy confirms that the actions of the Forest Service under the MAA remain a substitute means for achieving the same water quality control "as could be obtained through direct regulation" using the regional boards' conventional tools (such as reports, WDRs, and waivers).

To be sure, the Policy further states that neither the State Board nor the regional boards have given up their ultimate authority: neither may "delegate their NPS authorities and responsibilities to another agency," and they "may not indefinitely defer taking necessary action if another agency is not properly addressing a NPS problem." But this language confirms that the State Board, or the relevant regional board, must take affirmative action to *exercise* that authority, and thereby to abrogate, amend, or supersede the terms of an MAA. The 2004 NPS Policy, by itself, does not take that step.

The State Board in recent years has expressed dissatisfaction with the MAA and has considered a variety of alternatives, including a formal detailed waiver of WDRs for nonpoint sources on federal lands and a statewide approach specific to public and private livestock grazing. *See supra* at 13. The State Board ultimately rejected these options and instead left the matter in the hands of the regional boards. The Central Valley Regional Board has been working with the Forest Service on that issue, but it has

thus far not taken affirmative steps to vitiate the MAA. On the contrary, the current Basin Plan expressly reaffirms that the regional board "abides" by the existing MAAs, including specifically the 1981 MAA with the Forest Service. Indeed, the Basin Plan reiterates that that the MAA "waives discharge requirements" for certain Forest Service NPS discharges, provided that the Forest Service implements the BMPs and the MAA.

Despite this overwhelming confirmation that the MAA remains operative and continues to waive compliance with the reporting and permitting requirements of §§ 13260, 13263, and 13264, Plaintiffs assert that the Forest Service admitted in a draft Environmental Impact Statement concerning the BEH Allotments that it is required to obtain WDRs or a waiver from the regional board. But the statement they cite merely adverts to the Forest Service's ongoing discussions to develop relevant permits that would, to that extent, supersede the MAA. *See also supra* at 13. That the Forest Service is working with the regional board on options for displacing the MAA does not establish that the MAA has *already* been displaced.[5]

Accordingly, we conclude that Plaintiffs failed to show that the Government violated the reporting and permitting requirements of §§ 13260, 13263, and 13264. We therefore

---

[5] Plaintiffs also note that the Forest Service stated, in litigation concerning logging in another part of the State, that it had applied for an express waiver from the relevant regional board. It is not clear that the mere application for a waiver to cover a specific subject reflects any concession that the waiver was required to be sought in that case or that waivers are required generally. In any event, the cited suit was dismissed voluntarily and can give rise to no estoppel against the Government here. *United States v. Mendoza*, 464 U.S. 154, 160 (1984); *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002).

affirm the district court's grant of summary judgment on these issues.

## IV

Plaintiffs also allege that the Government violated § 313 of the Clean Water Act by authorizing livestock grazing that caused runoff that led to fecal coliform levels in local waterways in excess of the relevant water quality objectives in the Central Valley Regional Board's Basin Plan. This argument fails, because these Basin Plan objectives do not directly apply, of their own force, to individual dischargers but instead reflect standards that regulators must take into account in fashioning the requirements that *do* apply to dischargers (such as WDRs, waivers, and basin-plan prohibitions).

Plaintiffs contend that we have already held that a basin plan's objectives can be enforced against specific projects under § 313, citing our decisions in *Northwest Indian Cemetery*, 795 F.2d at 697, and *Marble Mountain*, 914 F.2d at 182–83. But the judicial enforceability of such water quality objectives against specific projects does not appear to have been contested by the defendants in those cases or otherwise presented as an issue for our resolution. Instead, in *Northwest Indian Cemetery*, the Government argued that the water quality standards in the basin plan had been formally or effectively superseded by the BMPs in the 1981 MAA, and we rejected that argument. As we explained, the BMPs did not displace the water quality standards but were "merely a means to achieve" them, and "[a]dherence to the BMPs does not automatically ensure that the applicable state standards are being met." 795 F.2d at 697. The Government did not otherwise contest that a court could enjoin a specific project that was alleged to result in a violation of a water quality objective, and we therefore had no occasion to

address whether that concession was or was not correct. Likewise, in *Marble Mountain*, the Government argued that the plaintiffs had not properly challenged, and could not successfully challenge, "the Forest Service's interpretation and application" of the relevant water quality objectives, but it did not contest that those objectives were directly enforceable against the particular project at issue. 914 F.2d at 182–83. We rejected the Government's arguments, holding only that "the plaintiffs properly challenged the [Government's] interpretation of state water quality objectives," and we remanded the case for the district court "to address the merits of that claim." *Id*. at 183; *cf. also Oregon Nat. Res. Council*, 834 F.2d at 852 (rejecting, as oversimplified, the district court's analysis of Oregon regulations concerning water quality standards and remanding for district court to determine "whether the activities . . . will violate the applicable regulations"). Here, however, we are squarely presented with the direct-enforceability issue that was uncontested and taken for granted in those cases.

As our detailed summary of the Porter-Cologne Act makes clear, the water quality objectives established by a regional board in a basin plan provide the relevant standards that must guide the overall package of regulatory actions that the board determines "are necessary to achieve the objectives." *See* CAL. WATER CODE § 13242(a). Thus, in requiring the board to establish such objectives, the Porter-Cologne Act also requires it to develop a "program of *implementation* needed for achieving water quality objectives." *Id*. § 13050(j)(3) (emphasis added). The tools for implementation provided by the statute include three different methods for imposing specific obligations on dischargers. First, the basin plan itself may set forth particular prohibitions "specify[ing] certain conditions or

areas where the discharge of waste, or certain types of waste, will not be permitted." *Id*. § 13243. Second, the board may impose "waste discharge requirements" under § 13263(a), which function as "permits" authorizing the specified discharges under the enumerated conditions. *Id*. § 13374. Third, the board may grant "waivers" under § 13269, which must contain conditions restricting the discharges covered by the waivers. *Id*. § 13269(a)(2). In invoking each of these tools, the regional board must consider the relevant water quality standards that it is seeking to implement. In particular, in issuing WDRs, the board must consider the beneficial uses of the relevant waterways, the "water quality objectives reasonably required" to protect those uses, and, importantly, "other waste discharges" that may contribute to a failure to achieve those objectives. *Id*. § 13263(a). Waivers may only be issued if the board determines that they are consistent with the relevant basin plan, and any such waiver must contain monitoring requirements to allow the board to evaluate "the adequacy and effectiveness of the waiver's conditions." *Id*. § 13269(a)(2).

Once the board translates the water quality objectives into particular prohibitions, WDRs, and waivers imposing restrictions on specific discharges or categories of discharges, the board and the California Attorney General may take appropriate steps to enforce those obligations on individual dischargers. For example, the Porter-Cologne Act allows a regional board to issue cease and desist orders in the event of an actual or threatened discharge in violation of WDRs or basin plan prohibitions. *See id*. § 13301. The board can also request that the Attorney General file an action for civil penalties for any discharges "in violation of a waste discharge requirement, waiver condition, certification, or other order or prohibition." *Id*. § 13350(a); *see also id*. § 13350(g). The board can likewise request that

the Attorney General file suit enjoining, and seeking civil liability for, unauthorized discharges made in violation of § 13264(a).  *See id*. §§ 13264(b), 13265(a), (b)(2).  The board can also impose civil liability for such violations of § 13264 administratively.  *Id*. § 13265(b)(1).

The parties have not cited, nor have we found, any provision of the Porter-Cologne Act that would make a discharger directly liable for violating a water quality objective contained in a basin plan that is *not* contained in applicable WDRs, waivers, or prohibitions.  *Cf. County of Sacramento v. State Water Res. Control Bd.*, 64 Cal. Rptr. 3d 302, 305–07 (Ct. App. 2007) (upholding inclusion, in WDRs applicable to a county facility, of the numerical water quality objective for a particular bacterium in the basin plan).  To the extent that discharges authorized by the board (*e.g.*, through WDRs or waivers) have resulted in a failure to attain water quality objectives, that might lead the board to modify previously issued WDRs or to terminate a waiver.  *See* CAL. WATER CODE § 13263(e) (stating that board, on its own motion, "may review and revise" WDRs); *id*. § 13263(g) (stating that there are no "vested right[s]" to continue discharges); *id*. § 13269(a)(2) (providing that waivers "may be terminated at any time").  Moreover, because the regional board sets water quality objectives by considering the "[w]ater quality conditions that [can] reasonably be achieved through the *coordinated control of all factors which affect water quality in the area*," *id*. § 13241(c) (emphasis added), the board could decide to respond to a failure to meet those objectives by restricting some uses deemed less valuable, while allowing the WDRs for other uses to remain unchanged.  The board's actions in addressing such a failure could also conceivably lead to administrative action, or a petition for a writ of mandate, against the regional board.  *See id*. § 13320(a) (providing for state board review of

regional board actions or failure to act); *id*. § 13330(b) (authorizing writ of mandate review in state court). But a discharge that otherwise complies with applicable WDRs, waivers, or prohibitions does not violate the Porter-Cologne Act merely because the water quality objectives are not being met.

For the reasons we have previously explained, the Government has not been shown to have violated the reporting or discharge restrictions of §§ 13260, 13263, or 13264. Nor have Plaintiffs contended that the Government has violated any prohibition contained within the relevant basin plan. *Cf. id.* § 13243. Although the regional board thus has not translated its water quality objectives into prohibitions, WDRs, or waivers that are directly enforceable against the Government, Plaintiffs ask us, in effect, judicially to assume that task and to hold that the Government's allowance of livestock grazing should be prohibited or restricted because it assertedly contributes, perhaps with other contributing causes, to a failure to achieve certain of the water quality objectives of the basin plan. This we cannot do. The Porter-Cologne Act assigns the task of developing a program of implementation of water quality objectives to the regional board, which can assess the problem as a whole and in light of other competing sources. *See id*. § 13050(j)(3). It does not assign that task to the federal courts.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Defendants with respect to Plaintiffs' claims based on asserted violations of the basis plan's water quality objectives.

**V**

We affirm the district court's denial of summary judgment for Plaintiffs and grant of summary judgment for Defendants.

**AFFIRMED.**